Ranney, J.
Upon two of the questions raised in argu-* ment, the court has found no difficulty, and I shall do no more *32 than state its conclusions without going into any extended examination.
For the plaintiffs in error it is claimed that, although the defendant should have been legally invested with all the powers ’of the Marietta and Cincinnati Company, yet this proceed ■ ing could not be maintained, because that company had exhausted its power of appropriation by the location and partial construction of its road upon another line.
The case of Moorehead v. The Little Miami R. R. Company, 17 Ohio Rep. 340, relied upon to support this position, furnishes a complete answer to it; and very clearly shows that the power to re-locate upon another line, for any of the causes specified in the charter, may be invoked until the construction of the road upon the original location has been completed. Among the causes which will justify such a change, is that of “ difficulty of construction.” Now, it must be very evident that, in many cases, these difficulties, although such as to make it impossible to secure a firm and safe foundation for the road, or such as to involve the company in bankruptcy to attempt to complete it, could not be discovered until after the location was made, and the construction had so far progressed as to develop them; and we entertain no doubt that the legislature intended to allow the company to extricate itself from such difficulties, by making a re-location. Although the causes for making this change are somewhat obscurely stated, we think they fall, substantially, within one or more of those allowed by that charter.
2. On the part of the defendant in error, as we understand the argument, it is claimed that, although the special act of February 28,1860, “for the relief of the creditors and stockholders of the Marietta and Cincinnati Railroad Company” (57 O. L. 128), and the proceedings thereunder had, should be held inoperative to invest, de jure, this organization with the powers conferred upon that company, yet, as it is de facto acting as a corporation, and exercising those powers, n ither its existence, nor its right to exercise the power of eminent domain, can be collaterally questioned. While we do not *33 question the correctness of many of the observations made in argument, or of the authorities brought to their support, we still think the proposition itself explicitly answered by the judgment of this court in The Atlantic & O. R. R. Co. v. Sullivant, 5 Ohio St. Rep. 276. In that case as in this, the attempt was made to appropriate lands upon which to construct a railroad: there as here, the organization professed to act as a corporation authorized to construct such a work; and in that case a valid and constitutional law existed, under which it claimed to have effected its organization. And yet, the court held that the right of such an organization to appropriate private property, depended 'upon the legal Validity of its certificate, through which its corporate powers were derived; and when that was so grossly defective as not to have named the termini of its road, or the counties through which it was to pass, the right to exercise the eminent • domain was denied. Corporate existence, and the power to take private property for public uses, can only be derived from legislative enactment. A grant of both are made indispensably necessary to the employment of the process invoked in this proceeding. Before a company can demand a judgment of condemnation, it must show that both have been conferred upon it by a valid law, and that it has substantially complied with the conditions, which the law has annexed to the exercise of its powers. How this may be proved, and under what circumstances those who have dealt with it as a corporation, may be estopped .to deny its corporate existence or powers, it is not material hereto inquire. No claim is made that this company has pretended to organize under any general law of the state; and,, on the other hand, it is not doubted, that it has effected a-regular organization in accordance with the provisions of the special act of February 23,1860. If that act is constitutional, no valid objection to these proceedings exists; if otherwise), the lands of the plaintiffs have been condemned without the-authority of lav,', and the judgment should be reversed.
3. From the preamble to this act, it appears, that the board» of directors of the 'Marietta and Cincinnati Company, repre *34 sented to the legislature that the corporation was hopelessly insolvent; that a decree had been rendered in Ross county, at the suit of mortgagees, for the sale of the road and its franchises; and that an agreement had been made between a large majority of the mortgage creditors, and the board of directors, acting with the approbation of a majority of the stockholders,'intended to secure to stockholders and unsecured creditors an interest in the road after the sale; that if the mortgagees became purchasers at the sale, they should hold the property subject to a reorganization upon the basis of the agreement. That doubts existed whether the sale would invest the purchaser with the franchises' and charter of the company, and “ to settle said doubts,” it was enacted that, if a sale was made and confirmed as provided in the decree, “all of the franchises of said company shall thereby pass to and vest in the purchaser or purchasers, and such purchaser or purchasers shall become invested with the said charter, and be entitled to reorganize thereunder by the creation of a stock, not exceeding eight millions of dollars, and by the election of a board of directors, with all the rights and privileges and .subject to all the liabilities, except as hereinafter provided, of .said company.” That “ all the property and franchises so ■decreed to be sold, shall forever remain exempt from the •claims of all creditors and stockholders, existing before such •sale and reorganization;” that preferred stock might bo -created to carry out the terms of the reorganization; and that •the directors should not incur debts without the concurrence -of two thirds of the stock represented at a meeting, nor the •corporation beyond, one third of the capital stock of the company. The other provisions of the act are not material.
The plaintiffs -insist that this act is in conflict with the first .and second sections of the thirteenth article of the constitution of the state; that it is an attempt to create a corporation out of the purchasers of this property, and by .special act to confer upon them corporate powers, and is ■therefore null and void. The sections referred to are as (follows:—
*35 Sec. 1. “ The general assembly shall pass no special act conferring corporate powers.”
Sec. 2. “ Corporations may be formed under general laws ; but all such laws may, from time to time, be altered or repealed.”
The defendant’s counsel insist that the act does not assume to confer corporate powers, but is simply declaratory of the effect of a sale of the road and franchises under the decree; that the object of the act is to remove doubts as to the effect of such a sale, which it does, not by conferring corporate powers, but by declaring that the sale shall transfer to the purchasers the powers and capacities theretofore conferred upon the Cincinnati and Marietta Company, which it sanctions as an incident of the sale and purchase, including the right of the purchasers to reorganize, without which the purchase of the franchises would be a barren acquisition in their hands. That the transaction assumed this form, there is no doubt; but this does not relieve us from the necessity of inquiring what it was in substance. Constitutional provisions would be of little value if they could be evaded by a mere change of forms. These provisions of the constitution are too explicit to admit of the least doubt, that they were intended to disable the general assembly from either creating corporations, or conferring upon them corporate powers, by special acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power ; of making such laws applicable to all parts of the state, and thereby securing the vigilance and attention of its whole representation; and finally, of making all judicial constructions of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class. We must give such a construction to the constitution, as will preserve its great leading objects intact; and we now proceed to inquire, whether this enactment can stand consistently with the full and just effect of these provisons.
To enable us to see clearly what the act has attempted to *36 accomplish, and what it must have effectually accomplished, to invest the defendant with the capacities and powers of the old charter, it may be well to consider what would have been their position, if this act had not been passed. They were mortgage creditors of the old company, having a decree for the sale of its road. If, without this act, they had become the purchasers of the property, they would also have been invested with the franchise of maintaining, operating, and making profit from the use of the road, according to the grant made to that company. But neither their mortgage nor decree gave them any right to, or lien upon, the corporate existence of the Marietta and Cincinnati Company; nor could any sale made under the decree have divested the stockholders of that company of this franchise, or have invested the purchasers with a corporate existence. The capacity to have perpetual succession under a special name, and in an artificial form; to take and grant property, contract obligations, and sue and be sued by its corporate name as an individual, were ■franchises belonging to the individual stockholders of that company, inalienable in the hands of. the artificial being thus created, and without any power “ to transfer its own existence into another body, nor could it enable natural persons to act in its name, save as its agents, or as members of the corporation, acting in conformity to the modes required or allowed by its charter.” Although it may be divested of its property, together with the franchise of operating and making profit from the use of its road, its corporate existence survives the wreck, and endures until the state sees fit to terminate it by a proper proceeding. It is hardly necessary to add, that a delegation of the power of eminent domain to a corporation as a necessary means to carry into effect the grant of its franchises, can not be made the subject of either grant or sale. These principles were so fully considered, and explicitly stated, in Coe v. The Columbus, Piqua and Indiana R. R. Co., 10 Ohio St. Rep. 372, as to require no further comments from us. •
Erom this hasty glance at the position of this company, *37 and its mortgage creditors becoming purchasers of its property, without the aid of the act in question, we can now determine, with a good degree of certainty, what the act must have effected, to make good the claim of the defendant, that it is a corporation invested with the power of eminent domain.
There is no pretense for saying that the governing body of. this organization, has, in any way, succeeded to the stock of the company, or is simply continuing the organization, and wielding the powers of the old company. On the contrary, the act declares that the entire charter shall pass from the company and vest in the purchasers; that they [the purchasers] may create a stock not exceeding $8,000,000, and upon it elect a board of directors. Indeed, so careful has the act been to place an impassable gulf between the old organization and the new, between the thing as it was, and as it was to be, that it is expressly declared, that both property and franchises “ shall forever remain exempt from the claims of all creditors and stockholders, existing before such sale and reorganization.”
Now, if the defendants are invested with the capacities a.nd powers which they claim, what has effected the transfer of the franchise of being a corporation, from the stockholders of the company to the purchasers at the sale? And what has invested them with the additional powers of creating a new stock, instituting a new governing body, and electing a new board of directors ? Counsel answer, the judicial sale, sanctioned, and the effect declared by the legislative act. But it must be admitted, that the mortgages gave no right to this franchise; that it never was judicially condemned or ordered to be sold, and that a sale without the act, would not have affected it. If, then, the act alone, either directly or indirectly, has been legally operative to take this franchise from the stockholders and vest it in the purchasers, what is this but conferring upon them, by “ special act,” not only corporate existence, but very important “corporate powers?” What the general assembly can not do directly, it can not do indirectly. To provide for the creation of corporations, is a *38 legislative function which, the general assembly is permitted to exert through general laws, but prohibited from applying to special cases; and it can no more authorize a court to decree into existence a particular corporation, or to make it result from a particular judicial sale, than it could accomplish the same purpose by a direct enactment. Although this judicial sale was very well calculated to obscure the naked reality of what was intended, it is no further significant than as fixing the time when, and the person upon whom, the general assembly intended to confer the corporate powers of the old charter, and those particularly specified in this enactment. If the mortgagees shall become purchasers at the sale, the charter shall pass to them, and invest them with the corporate powers to reorganize, create a new stock, and elect a new board of directors; and from thenceforth no right of any former stockholder or creditor shall be recognized to exist — is the substance of the enactment. It is said these are not rights newly conferred, but simply declared as the result of the judicial sale. It will not do to deceive .ourselves with mere forms of expression. It is certain that the mortgagees, as such, were invested with no corporate capacity; and it is equally certain that a mere purchase at the sale would have invested them with none; if they have it, then, it must have arisen, in some way, from the legal effect of the legislative enactment; and as without the enactment, they had it not, and, with the enactment, are invested with it, it would seem-to follow that it was not only conferred by the enactment, but also newly conferred. It does not belong to human power to make that which is false, true by declaring it to be so. A statute in this form, although inoperative to change the fact, or rights dependant upon the fact, may nevertheless have its effect as a new and prospective legislative regulation. The legislature declared that the water craft law, as originally passed, extended to causes of action arising outside of the limits of the state; but the supreme court refused to give the declaration effect, and upheld the statute as prescribing a new rule for future cases. If in the case *39 before us, tbe legislature intended to declare as a fad, that tbe judicial sale would, as a legal effect, invest tbe purchasers with corporate capacity, they declared to be true what this court has judicially settled was untrue. The only other effect which their enactment could have, would be derived from the supposed legislative power, either of giving to the sale the new and further effect of investing the purchasers with the corporate capacity of the old company, or of conferring the same powers directly upon them — and, thus, in either way, of investing these persons with corporate capacity and powers, by a “special act.”
We have examined this question with much care, not only with a view of giving a proper construction to these important constitutional provisions, but also of subjecting the defendants to as little embarrassment as possible in the control and management of an important line of railroad communication. But in whatever way we have been able to view it, we are unanimous in the opinion that the general assembly mistook its powers in the passage of the act in question, and that the defendants can derive no authority from it. Our conclusion is perhaps the less to be regretted, as the tenth section of the general law of April 11, 1861, for the sale and reorganization of railroads, seems to have fully provided for this case, and to enable the defendants to put themselves on a perfect equality with all other companies similarly situated, in the state.
The judgment of the probate court, and that of the common pleas affirming it, must be reversed.
Brinkrrhoee, C.J., and Scott, Wilder, and White, JJ., concurred.